```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
```

```
LAWRENCE THOMAS,                :      HON. JEROME B. SIMANDLE

            Plaintiff,          :      Civil No. 09-1323 (JBS-JS)

      v.                        :
                                              OPINION
CUMBERLAND COUNTY CORRECTIONAL  :
FACILITY, et al.,               :

            Defendants.         :
```

APPEARANCES:

William Riback, Esq.
Lauren Plevinsky, Esq.
WILLIAM RIBACK, LLC
132 Haddon Avenue
Haddonfield, NJ 08033
      Attorney for Plaintiff

Steven L. Rothman, Esq.
LIPMAN, ANTONELLI, BATT, GILSON, MALESTEIN, ROTHMAN & CAPASSO
110 N. Sixth Street, PO Box 729
Vineland, NJ 08362
      Attorney for Defendants

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

This matter comes before the Court on Defendants' motion for summary judgment or, in the alternative, to exclude Plaintiff's expert. [Docket Item 112.]  This dispute arises out of an attack suffered by Plaintiff Lawrence Thomas at the hands of other inmates and in the presence of corrections officers of the Cumberland County Jail while Mr. Thomas was being held as a

pre-trial detainee.  Plaintiff filed a two-count Second Amended Complaint on November 13, 2009. [Docket Item 32.] Plaintiff alleges violation of 42 U.S.C. § 1983 by all Defendants for incitement, failure to protect, failure to train, and failure to supervise.  Additionally, Plaintiff alleges violation of the New Jersey Civil Rights Act for violation of due process by housing Plaintiff, a non-violent pre-trial detainee, in the same area of the facility as convicted felons with a history of violence.[1]

Because Plaintiff has come forward with sufficient evidence to create a material factual dispute whether Defendant Corrections Officer Fernando Martinez incited the attack on Plaintiff and acted with the requisite deliberate indifference to the attack, the Court will deny Defendants' motion for summary judgment in favor of Defendant Martinez.  However, because Plaintiff fails to point to evidence sufficient to raise a dispute of fact as to whether Defendant James Wilde exhibited more than negligence leading to Plaintiff's injuries, the Court will grant Defendants' motion as to Defendant Wilde.

Furthermore, the Court finds that Plaintiff has not come forward with sufficient evidence to create a material factual dispute regarding evidence as to whether the Cumberland County Defendants were deliberately indifferent to the unreasonable risk

---

[1] Count II is not addressed by Defendants in their motion and has, to the Court's knowledge, never been dismissed or withdrawn.

to Plaintiff's rights posed by the County's alleged training and supervisory deficiencies.  Accordingly, the Court will grant summary judgment against Plaintiff on the municipal liability claims.  Finally, because Plaintiff's expert's conclusions are adequately based on objective information and data to survive Defendant's challenge on reliability grounds, the Court will deny Defendants' motion to exclude.

## II.   BACKGROUND

### A.   Facts

The facts included in this Opinion were taken from the parties' statements of undisputed material fact or that are otherwise supported in the record. Where facts are disputed, the dispute is noted. On June 4, 2008,[2] Plaintiff entered Defendant Cumberland County's custody for shoplifting and various contempt warrants and was confined in the Cumberland County Correctional Facility ("CCCF") pending trial.  Thomas Dep. 41:1-4.[3]  He remained incarcerated at CCCF until July 27, 2008, when the

---

[2]    The Court notes that Plaintiff alleges in his Amended Complaint that he was initially arrested on February 4, 2008 and incarcerated thereafter.  Am. Compl. ¶ 13.  However, Plaintiff's Deposition testimony states unequivocally that he entered custody at the CCCF on June 4, 2008.  Thomas Dep. 41:1-4.  The Court will defer to Plaintiff's sworn testimony on this issue, though the difference is immaterial to the resolution of this motion.

[3]    Plaintiff alleges that the shoplifting charge was ultimately dismissed. Am. Compl. ¶ 13.

3

events alleged in his Second Amended Complaint took place.  On
that date, Plaintiff and a group of inmates engaged in an
argument in which Plaintiff was accused of stealing food from
other inmates.  The argument progressed to the point where
Plaintiff was physically attacked by at least two other inmates.[4]
Plaintiff sustained severe injuries in the assault including
permanent damage to and loss of sight in his left eye, for which
he argues Defendants are responsible.

        During Plaintiff's detention at CCCF in June and July of
2008, up until the date of the attack, Plaintiff was assigned to
a cell in D-Pod on the second tier of the Pod.  Thomas Dep.
43:20-22, 45:25-46:2.  Defendants Corrections Officers Martinez
and Wilde were on duty during the incident and both were present
in the Pod.  Chasmer Dep. 23:4-11.  The D-Pod was relatively
small; people on the lower tier could see and hear what was
happening on the upper level.  Id. 16:12-13.  The second tier of
cells, also called the "mezzanine" (Id. 47:18-21), was open to
the floor below.  Santiago Dep. 46:17-20.  There were 28 cells,
and approximately 95-100 inmates housed in the Pod.  Chasmer Dep.
37:19-38:5.

---

        [4]    The Record demonstrates that at least two inmates
struck Plaintiff during the incident.  Plaintiff was struck in
the face by inmate Leonardo Santiago "knocking him to the
ground," and was then "punched . . . in the eye while . . .
laying on the ground" by inmate Michael Cruz.  Martinez Dep.
50:17-51:7.

Late in the evening of July 7, 2008, as the evening lockdown was approaching, Plaintiff was bartering[5] for rice and soup with another inmate on the second tier.  Thomas Dep. 60:1-15.  After Plaintiff had acquired his rice from another inmate, Plaintiff returned to his cell, placed the rice in a bowl with some water, and left his cell, intending to go downstairs to warm it up in the microwave.  Thomas Dep. 59:20-61:23.

When he exited his cell, there was a crowd of inmates gathered outside in the corridor.  Thomas Dep. 61:23-62:1.  The crowd consisted of at least 12 people, all of Hispanic origin.  Thomas Dep. 72:21-73:5.  According to Plaintiff Thomas, Defendant Officer Fernando Martinez was among the crowd.  Thomas Dep. 62:8-9.[6]  The crowd had gathered outside Thomas' cell because they were angry with Plaintiff based on their belief that he had stolen someone else's food.  Santiago Dep. 48:8-12.  The argument began when an inmate in the crowd (identified as "Fransanti" by Plaintiff) accused Plaintiff of stealing food, and increased in volume as others joined in.  Thomas Dep. 62:13-22.  Inmate Leonardo Santiago said that Officer Martinez was present because

---

[5]     Plaintiff is the only inmate in the record to describe his activity as "bartering."  The other inmate witnesses, e.g., William Chasmer, Bruce Childress, and Leonardo Santiago, all described his activities as more akin to "stealing."  Chasmer Dep. 17:17-20, Santiago Dep. 17:7-23.

[6]     Inmate witness William Chasmer, who testified that he was in the crowd on the second tier, said Martinez was down on the first tier during the entire event.  Chasmer Dep. 14:11-14.

he knew about Thomas' food-stealing habits.  Santiago Dep. 22:18-21.  Santiago testified that both Martinez and Defendant Officer James Wilde, who was also present in the D-Pod at this time, were aware of the other inmates' anger with Plaintiff.  Santiago Dep. 112:3-13.  Martinez himself testified that he was aware Thomas was a "problem inmate."  Martinez Dep. 51:18-20.

The argument on the upper tier grew into a heated "verbal dispute," between Plaintiff and the other inmates, lasting for approximately "two to three minutes." Chasmer Dep. 18:4-9.  As the dispute unfolded, Defendant Corrections Officer James Wilde was stationed at a desk,[7] and about 15 feet away from the verbal dispute.  Eventually, Defendant Officer Martinez interjected into the dispute, saying "If you guys don't fight or break it up, I'm going to lock everybody down."  Thomas Dep. 78:14-15.[8]  Chasmer interpreted this statement to mean literally what it said -- if you are going to fight, do so, otherwise stop arguing.  Chasmer

---

[7]     The desk was located on the lower level about 20 feet from the staircase connecting the second tier to the lower level. Thomas Dep. 80:2-13, 81:8-12.

[8]     There are numerous accounts and versions of this statement; Plaintiff, in his Complaint, alleges that Defendant Martinez yelled "[e]ither fight or I am locking you up."  Am. Compl. at ¶ 18.  In his deposition, however, Plaintiff testifies that Defendant Martinez exclaimed "'F' this shit, if you guys ain't going to fight, break it up or I'm going to lock the whole damn pod down."  Thomas Dep. 62:23-63:2.  Furthermore, witness-inmate Chasmer testified that Defendant Martinez's statement was, "[i]f you ain't going to fight sit down and break it up." Chasmer Dep. 18:11-15.

Dep. 35:22-36:3.  The response of the other inmates to Martinez's statement was to laugh; the effect of the statement was not to disperse the crowd at all.  Thomas Dep. 78:8-10; Chasmer Dep. 48:7-9.

Thomas testified that at this point he concluded that he would be unable to explain himself to the other inmates or rely on protection from Martinez, because he interpreted Martinez's statement as an indication that he hoped a fight would start. Thomas Dep. 63:22-64:5.  Therefore, Thomas testified that he formed a plan to get down to the lower tier and seek protection from Wilde, who he believed might be more inclined to protect him.  Id. 64:2-4.  Consequently, Thomas pushed his way down the stairs past the inmates surrounding him, who followed, as did Officer Martinez.  Id. 78:2-7.

As Thomas was making his way downstairs, he heard an inmate yell up at him from downstairs "if you want to take something from people, motherfucker, come down here and take stuff from me."  Id. 64:9-12.  Santiago testified that he was the inmate who yelled this statement at Thomas.  Santiago Dep. 23:9-11.  Other inmates started yelling explicit threats of violence, from both downstairs and behind him on the second tier.  Thomas Dep. 77:18-23.  Chasmer, who was in the crowd of inmates following Thomas down the stairs, said he could tell, as could anyone in the crowd, that a fight was imminent, and that he, at least, wanted

to see a fight happen.  Chasmer Dep. 17:7-17; 22:9-14.

The other inmate witnesses testified that, contrary to his account, Thomas was heading down the stairs aggressively to confront Santiago about his taunts, rather than simply trying to get out of the dangerous situation.  Chasmer Dep. 20:12-21:13; Santiago Dep. 23:13-14.  Thomas, by contrast, testified that he was only hoping to reach Officer Wilde, and that when he did, Wilde would signal for backup or otherwise offer to help him get out of the situation.  Thomas Dep. 64:14-17.  Wilde apparently took no action as the argument was progressing.  Chasmer Dep. 15:19-20.

When Thomas reached the bottom of the stairs, other inmates from the lower tier crowded around, blocking his path to Wilde at the police desk.  Thomas Dep. 64:18-24.  The entire Pod had gathered around Thomas at this point.  Chasmer Dep. 24:13-20.  So Thomas tried to get to Wilde by going around the stairs to escape the crowd.  Thomas Dep. 64:24-65:2.  Thomas testified that as he was going around the stairs, he lost consciousness, without seeing what struck him.  Id. 65:2.

Santiago testified that, upon reaching the lower tier, Thomas immediately approached his cell, which was behind the stairs.  Santiago Dep. 26:3-13.  Santiago testified that he struck Thomas at least partially in self defense, because Thomas had approached him threateningly.  Id.  Chasmer testified that

Santiago struck Thomas within 15-20 seconds of Thomas reaching the first tier.  Chasmer Dep. 25:11-13.  Martinez had remained immediately adjacent to Thomas, and was standing right next to him when Santiago struck him.  Id. 50:8-15.

Thomas was knocked unconscious by the blow struck by Santiago, immediately after which Martinez attempted to restrain Santiago, but another inmate, Michael Cruz, approached Thomas and struck him once or twice while Thomas was down.  Chasmer Dep. 25:19; 49:20-21.  Wilde took no action during the exchange of blows.  Id. 25:20-21.[9]  The blows of the two different inmates happened one immediately after the other, only seconds elapsing between the first and last blows.  Id. 25:22-26:2.  Santiago testified that after Cruz hit Thomas, several other inmates joined in striking him as well as he lay on the floor.  Santiago Dep. 28:12-22.  Then Martinez yelled for everyone to lock down.  Chasmer Dep. 26:5-6.  The inmates reluctantly complied.  Id. 26:12-13.

Thomas believed he must have been struck several times, including with the use of a wooden deck brush, though he testified that he had no direct memory of the attack itself.  He based this conclusion on the extent of his bruises and injuries, and the fact that he observed a bloodied deck brush being kicked

---

[9]    Santiago testified that Wilde was not in the Pod at all during the altercation, because he had stepped out for a snack. Santiago Dep. 28:23-29:10.

out of the way after he regained consciousness.  Thomas Dep. 84:19-24; 99:3-100:21.

The other inmate witnesses testified that they believed Thomas "had it coming" because the other inmates on the Pod were getting tired of his aggressive behavior.  Chasmer 17:17-20; Santiago Dep. 17:7-23.  At least one inmate was generally glad to see the fight occur because they believed it was justified. Chasmer Dep. 27:15-19.  Santiago claimed that Thomas had been warned four days prior to the fight that he would be injured if he continued to take other inmates' food.  Santiago Dep. 67:22-68:3.

The other inmate witnesses were unanimous that the officers could and should have stopped the fight before it occurred either by calling for backup or by telling the inmates to lock down. Chasmer Dep. 19:4-18; Santiago Dep. 24:7-11.  Inmate witness Bruce Childress, for example, testified that neither officer did anything to break up the fight, and that Officer Martinez "allowed them to get into the fight" through his statement and by taking no action to stop the argument from accelerating. Childress Cert. at 3.  Chasmer said the guards at CCCF would often successfully intervene in an argument and tell the participants to disperse.  Chasmer Dep. 51:5-8.

Neither Santiago nor Cruz were charged with a crime for the attack, but both were disciplined by the CCCF by being placed in

10

solitary confinement; Santiago was eventually transferred to a different prison in Pennsylvania.  Santiago Dep. 69:1-23.

The total time elapsed between the initial argument and the subsequent fight was "approximately three to four minutes." Chasmer Dep. 31:1-4.  Neither officer called for backup from other officers in the facility during the course of the dispute.

Plaintiff suffered serious eye injury.  During the course of the assault, Plaintiff sustained several "facial and ocular injuries," as well as a concussion.  Calenda Rep. at 1.[10] Furthermore, as a result of the injuries sustained, Plaintiff was left with "no vision . . . in his left eye."  Calenda Rep. at 2.

**B.   Procedural History**

Plaintiff filed his Complaint, initially proceeding pro se, on March 23, 2009 and later, a Second Amended Complaint, drafted by his current counsel, on November 13, 2009.  [Docket Items 1 & 32.]  In his Second Amended Complaint, Plaintiff alleges that Defendants' conduct violated Plaintiff's Eighth Amendment rights to be free from cruel and unusual punishment, pursuant to the Federal Civil Rights Act, 42 U.S.C. § 1983, and giving rise to a claim under the New Jersey Civil Rights Act Section 10:6-2

---

[10]    The specific injuries included: "extensive bleeding inside, on the surface of, and behind the eye; a very deep eyelid laceration; a long, full thickness laceration along his sclera . . . ; uveal tissue protruding through portions of the scleral laceration; an irregularly shaped pupil; and orbital fractures with entrapment of one of the muscles that control his eye's movement." Calenda Rep. at 1.

("N.J.S.A."). Plaintiff named Cumberland County, Warden Glenn
Sanders, Lieutenant Michael Palau, Captain Kenneth Lancken,
Correctional Officer James Wilde, and Correctional Officer
Fernando Martinez, as well as John Does 1-10. Compl. ¶ 5-12.
Defendants answered on May 6, 2009. [Docket Item 10]. Defendants
filed their motion for summary judgment and, in the alternative,
to bar the testimony of Plaintiff's expert, on April 5, 2011.
[Docket Item 112]. On May 16, 2011, Plaintiff filed his
opposition to Defendants' motion. [Docket Item 114]. Lastly, on
June 2, 2011, Defendants filed a reply brief in support of their
motion. [Docket Item 116].  On December 7, 2011, the Court held
oral argument on the motion, counsel for all parties appearing.

## III. DISCUSSION

### A.   Standard of Review

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed.R.Civ.P.
56(a). A fact is "material" only if it might affect the outcome
of the suit under the applicable rule of law. Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment will not
be denied based on mere allegations or denials in the pleadings;
instead, some evidence must be produced to support a material
fact. Fed.R.Civ.P. 56(c)(1)(A); United States v. Premises Known

12

as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993). However, the Court will view any evidence in favor of the nonmoving party and extend any reasonable favorable inferences to be drawn from that evidence to that party. Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

Where the nonmoving party bears the burden of persuasion at trial, the moving party may be entitled to summary judgment merely by showing that there is an absence of evidence to support an essential element of the nonmoving party's case. Fed.R.Civ.P. 56(c)(1)(B); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

**B.   Section 1983 Claims**

Plaintiff alleges that Defendants violated his Eighth Amendment rights to be free from cruel and unusual punishment. All parties argue the motion assuming that the Eighth Amendment applies to Plaintiff, despite the fact that, as a pre-trial detainee, Plaintiff is not subject to the Eighth Amendment's protections.  Instead, the Fourteenth Amendment's Due Process Clause governs.  See A.M. ex rel J.M.K. v. Luzerne County Juvenile Detention Ctr., 372 F.3d 572, 579 (3d Cir. 2004).

Plaintiff claims that Defendants Martinez and Wilde are liable to him for his injuries for failing to adequately protect him from the obvious danger posed by his fellow inmates and for failing to intervene during the assault. Pl's Br. in Opp. to Def.'s Mot. 5-6. Plaintiff also claims that Defendant Martinez

13

"incited [the] inmates to violence." Pl's Br. in Opp. to Def.'s Mot. 6. Additionally, Plaintiff claims that the Cumberland County Defendants are liable for "fail[ing] to properly train and supervise its Correction Officers" which led to Plaintiff's injuries. Pl's Br. in Opp. to Def.'s Mot. 1. Plaintiff seeks relief under 42 U.S.C. § 1983, as well as, N.J. Stat. Ann. § 10:6-2 for alleged violations of his constitutional rights.

For Plaintiff's failure-to-protect claim, failure-to-intervene claim, and incitement claim (the claims against Defendants Martinez and Wilde), Defendants argue that summary judgment is appropriate because Plaintiff is unable to show the requisite facts establishing that Defendants Martinez and Wilde acted with deliberate indifference or that Defendant Martinez possessed the intent to incite violence.  Furthermore, Defendants argue, with regard to the County Defendants, that Plaintiff has not alleged facts which support a claim of a policy or custom which violates Plaintiff's civil rights necessary for municipal liability.

For the reasons next discussed, the Court finds that Plaintiff has created a genuine issue as to whether Defendant Martinez possessed the necessary subjective culpability under the Fourteenth Amendment, and the Court will deny summary judgment against Plaintiff's Section 1983 claims with respect to Defendant Martinez.  However, Plaintiff has not pointed to a dispute of

14

material fact in the record as to Defendant Wilde's subjective culpability.  Additionally, Plaintiff has not pointed to a material dispute of fact as to whether the Cumberland County Defendants failed to properly train the Defendant Officers, and as to whether they failed to properly supervise the Defendant Officers.  Consequently, the Court will grant summary judgment against Plaintiff's Section 1983 claims with respect to the Cumberland County Defendants.

### 1.   Failure-to-protect

Plaintiff's failure-to-protect claim alleges that Defendants Martinez and Wilde were willfully indifferent to his safety by permitting and/or inciting the assault and battery. Defendants argue that summary judgment is appropriate against Plaintiff's failure-to-protect claim because he is unable to establish that Defendants Martinez and Wilde possessed the requisite subjective culpability of deliberate indifference.

### a.   Deliberate Indifference

In assessing a pre-trial detainee's failure-to-protect claim, as opposed to a convicted inmate's claim, the Third Circuit has not determined a specific level of subjective culpability of the defendant's that meets the "shocks the conscience" standard under the Fourteenth Amendment.  Jacobs v. Cumberland County Dept. of Corr., Civ. No. 09-0133, 2010 WL 5141717, at *4 (D.N.J. Dec. 8, 2010)(internal citation

15

omitted)(noting that "a violation of the Fourteenth Amendment right to substantive due process may be shown by conduct that 'shocks the conscience'"). Most cases that have considered the issue have stated that the Fourteenth Amendment provides a pre-trial detainee at least as much protection as the Eighth Amendment "deliberate indifference" standard. See Urrutia v. Harrisburg County Police Dept., 91 F.3d 451, 456 (3d Cir. 1996) (holding that a pre-trial detainee plaintiff "is certainly entitled to the level of protection provided by the Eighth Amendment"). In similar cases, the Third Circuit has indicated that deliberate indifference is the appropriate standard in the context of a Fourteenth Amendment failure-to-protect claim. Luzerne County, 372 F.3d at 587. The Third Circuit has been clear, however, that "negligent conduct is never egregious enough to shock the conscience." Id. at 579. In other words, mere negligence or inattention by a corrections officer in failing to protect a pretrial detainee from violence at the hands of another inmate is not enough to rise to the level of a constitutional violation under the Fourteenth Amendment. On the basis of this precedent and because neither party argues that a different standard should apply, the Court evaluates Plaintiff's claim of a Fourteenth Amendment substantive due process violation under the deliberate indifference standard.

Under the deliberate indifference standard, officers and

prison officials have a duty "to take reasonable measures to protect prisoners from violence at the hands of other prisoners." Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997) (citations and internal quotations omitted).  For a failure-to-protect claim, Plaintiff must provide some evidence establishing that (1) "the conditions in which he was detained entailed a sufficiently serious risk of harm"; (2) the Defendants acted with "deliberate indifference" to his health and safety; and (3) causation. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Hamilton, 117 F.3d at 746. Defendant Officers "must actually [have been] aware of the existence of the excessive risk; it is not sufficient that [Defendants] should have been aware." Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001)(emphasis added).  Defendants focus their attack on Plaintiff's inability to prove the subjective element of deliberate indifference.

        i.    Defendant Martinez

Defendants argue that Plaintiff has not introduced evidence that raises a dispute over whether Defendant Martinez intended to cause Plaintiff harm when he, allegedly, incited the inmates to fight.

"To overcome a motion for summary judgment, a plaintiff must come forward with evidence from which it can be inferred that the defendant-officials were . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm." Betts v.

New Castle Youth Dev. Ctr., 621 F.3d 249, 259 (3d Cir. 2010)
cert. denied, 131 S. Ct. 1614, 179 L. Ed. 2d 502 (2011)(quoting
Beers-Capitol, 256 F.3d at 132.  When a prison guard incites
other prisoners to beat a fellow inmate, "it is as if the guard
himself inflicted the beating as punishment." Northington v.
Jackson, 973 F.2d 1518, 1525 (10th Cir. 1992).  Thus, Plaintiff's
evidence will meet the deliberate indifference standard if
evidence in the record permits a reasonable jury to find "that a
prison official intended to cause him serious harm by inciting
other inmates to do violence against him." Purkey v. Green, 28
Fed.Appx. 736, 745 (10th Cir. 2001).  See also Luzerne County,
372 F.3d at 579 ("conduct intended to injure most likely will
rise to the level of conscience-shocking.").

In asserting a failure-to-protect claim under the Fourteenth
Amendment via an allegation of incitement of inmate violence on
behalf of a corrections officer, Plaintiff must provide some
evidence to support the inference that he faced "a substantial
risk of serious harm" and that the responsible prison official
intended that he be harmed or was at least consciously
indifferent to Plaintiff's safety.  Jones v. St. Lawrence, Civ.
No. 408-095, 2008 WL 5142396, at *5 (S.D. Ga. Dec. 5, 2008)
(citing Farmer, 511 U.S. at 834).  For example, this District, as
well as other courts, have held that "[a]n inmate being labeled a
snitch creates a substantial risk of harm." Rodriguez v. Hayman,

18

Civ. No. 08-4239, 2009 WL 4122251, at *7 (D.N.J. Nov. 23, 2009).
See also Benefield v. McDowall, 241 F.3d 1267, 1271 (10th Cir.
2001) (holding that prison officials labeling an inmate a snitch
satisfies the Farmer standard); Reece v. Groose, 60 F.3d 487, 491
(8th Cir. 1995) (holding that an inmate being a known snitch is
an obvious risk for which prison officials must take reasonable
measures to abate the risk).  However, "'[a]bsent some factual
showing that the comments by the prison officials actually risked
inciting other inmates against [the plaintiff],' a court should
not assume that other inmates would be incited to attack the
plaintiff." Gill v. Calescibetta, Civ. No. 9:00-1553, 2009 WL
890661, at *12 (N.D.N.Y. Mar. 31, 2009) (quoting Dawes v. Walker,
239 F.3d 489, 493-94 (2d Cir. 2001), overruled on other grounds,
Swierkiwicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152
L.Ed.2d 1 (2002)).

Plaintiff claims that Defendant Martinez's statement, "If
you guys don't fight or break it up, I'm going to lock everybody
down,"[11] incited the other inmates to assault Plaintiff.
Defendants concede that "this statement took place during" the
incident.  Reply to Pl.'s Opp. 16.  However, Defendants argue
that Plaintiff has offered no evidence raising a dispute of fact
over whether Defendant Martinez's statement permits an inference
that he possessed the requisite intent to cause harm to

_____

[11]     For differing accounts, see supra, note 8.

19

Plaintiff, as exemplified by his defense of Plaintiff and removal of the initial assailant (Santiago) off of Plaintiff.

Furthermore, Defendants argue that, although Defendant Martinez may have "chose[en] his wording poorly," his intention was "not to single out the Plaintiff and request that [the] crowd assault him."  Reply to Pl.'s Opp. 17. Moreover, Defendants argue that Defendant Martinez's statement was "clearly effective in de-escalating the situation" on the second tier, since the assault did not occur until the group descended to the lower level and Plaintiff was not actually attacked by any of the inmates on the second tier.

However, the facts in the record would permit a jury reasonably to infer from Martinez's statement that he <u>did</u> intend to encourage a confrontation (he did, after all, announce that the inmates' choices were to either fight or to be locked in their cells), or was at least deliberately indifferent, <u>i.e.</u>, reckless, to the possibility that his words would be so interpreted.  Non-party witnesses testified that the comment caused the inmates to laugh rather than disperse, and was interpreted as literally encouraging physical violence by at least one inmate.  Chasmer Dep. 335:27-36:3.  Accordingly, Plaintiff has demonstrated facts from which a jury could conclude that Defendant Martinez was deliberately indifferent when he said "[e]ither fight or I am locking you up."

20

2.   <u>Failure-to-Intervene</u>

Defendants argue that Plaintiff has not introduced evidence that raises a dispute of fact over whether Defendants Martinez and Wilde's conduct prior to and during the assault constitutes deliberate indifference.

On this point, the parties disagree on the appropriate standard governing the Defendant officers' duty to intervene. Plaintiff argues that he can prove a § 1983 failure to protect violation by showing that the officers (1) were aware of a serious risk to the inmate's safety, (2) the officer had a realistic and reasonable opportunity to intervene, and (3) instead took no action, citing <u>Matthews v. Villella</u>, 381 F. App'x 137 (3d Cir. 2010), and <u>Smith v. Mensinger</u>, 293 F.3d 641, 650-51 (3d Cir. 2002).

Defendant argues, instead, that the "realistic and reasonable opportunity to intervene" standard is inapplicable to a case of inmate-on-inmate violence, claiming that the Third Circuit has expressly limited that standard to cases of liability of an officer who is accused of permitting another officer to exercise excessive force on an inmate.  Both <u>Matthews</u> and <u>Smith</u> were such cases.  Instead, Defendant argues that to prove his case, Plaintiff must prove, (1) a substantial risk of serious injury, and (2) that Defendant was deliberately indifferent to that risk.

21

This dispute does not entirely clarify at which points the parties disagree.  Apparently, Defendants argue that merely showing that the officer had a reasonable opportunity to intervene (and did not do so) is insufficient to show deliberate indifference, while Plaintiff argues that it is sufficient.

To the extent that Plaintiff argues that the "reasonable opportunity to intervene" standard would permit a jury to assign liability under § 1983 without finding requiring proof of subjective awareness of a substantial risk to Plaintiff, he is mistaken.  See Luzerne County at 587 ("the deliberate indifference standard in this context requires evidence that the defendants were deliberately indifferent to a substantial risk of harm to [the plaintiff] and did nothing to prevent it.").  The Court will, consequently, apply the standard from Luzerne County, which addressed a Fourteenth Amendment failure-to-protect claim similar to Plaintiff's.

Additionally, the Court recognizes that "[p]rison guards are not constitutionally required to take heroic measures and risk serious physical harm by intervening immediately in an inmate's . . . assault on another inmate." Holloman v. Neily, Civ. No. 97-8067, 1998 WL 828413, at *2 (E.D. Pa. Nov. 25, 1998).  "Calling for backup in such circumstances [where sufficiently serious risk is subjectively known] would be a reasonable response." Holloman, 1998 WL 828413, at *2 (citing MacKay, 48

22

F.3d at 493). In <u>Holloman</u>, the District Court for the Eastern
District of Pennsylvania held that

> defendant's averments that he attempted to intervene but
> found it impossible to do so without risking injury to
> himself and that he separated plaintiff and his assailant
> as soon as practicable . . . show[ed] the absence of a
> triable issue of fact regarding the reasonableness of
> defendant's reaction to the assault and any deliberate
> indifference on his part.

<u>Id.</u> at *2.

### a.   Defendant Martinez

According to witness inmate William Chasmer, immediately
after Plaintiff was "knocked . . . out with a slap . . . Martinez
went to grab [the first assailant, Santiago] . . . [and] started
screaming for everybody to lock in." Chasmer Dep. 25:16-26:6.

Plaintiff has provided evidence that the verbal dispute
lasted several minutes prior to any blow being struck, during
which time Defendant Martinez was immediately present. His two
acts of intervention during the fight were to make his, at best,
ambiguous statement that the inmates should either fight or would
get locked down in their cells, and subsequently to restrain
Santiago after Santiago struck Plaintiff. Santiago himself
stated that Martinez could have stopped the argument before it
escalated into a fight by ordering the participants to return to
their cells. Santiago Dep at 24:7-11 ("Officer Martinez could
have stopped that too, you know, he could have said everybody go
to the room. He could have say that, but he don't say that.").

23

Additionally, testimony of conditions of escalating threats, and Martinez's immediate proximity to but lack of intervention into the escalating situation would permit a jury reasonably to conclude that Plaintiff was subjectively aware of the serious risk of injury.

While the Court recognizes that this testimony could be clouded by hindsight or self-justifying behavior, and might be disbelieved by a reasonable factfinder, the Court likewise cannot simply discredit the testimony of a participant in the fight on the basis of its credibility.  Thus, the Court concludes that Plaintiff survives summary judgment on his claim for failure to protect against Defendant Martinez because he has pointed to evidence raising at least a dispute of fact that Martinez was subjectively aware of a serious risk of injury to Plaintiff (he discussed the possibility of a fight and he was in the midst of the dozen inmates threatening Plaintiff for several minutes), but took no action to order dispersal or otherwise intervene until after the serious injury had already occurred.[12]

---

[12]     The duty to protect a detainee from an obvious risk of bodily injury does not require the corrections officer to impair his own safety, such as by jumping in between two fighting inmates.  Likewise, a corrections officer will not be constitutionally liable for the spontaneous outbreak of a fight between inmates, without the officer's intent that an inmate in his custody by harmed.  But where, as in this case, Plaintiff points to evidence from which a reasonable jury could conclude that Officer Martinez was in the midst of a large group of inmates threatening to beat up Plaintiff Thomas and that he participated in giving the go-ahead for them to do so, he becomes

b.   Defendant Wilde

With respect to Defendant Wilde, however, Plaintiff has not presented evidence from which a factfinder could reasonably find that Wilde's inaction amounted to more than mere negligence. Plaintiff alleges that Defendant "Wilde was . . . present during the entirety of th[e] incident, idly watching . . . just st[anding] by [his] desk and did not move at all throughout the entirety of the incident."  Pl's Br. in Opp. to Def.'s Mot. 10.

However, Plaintiff is unable to point to any evidence from which a factfinder could reasonably infer that Wilde was subjectively aware of the risk to Plaintiff.  There is no testimony about Wilde's statements or understanding beyond the witnesses' opinions and speculation that Wilde should or must have been aware of the impending fight prior to any violence actually occurring.  Additionally, there is no evidence from which a jury could reasonably conclude that once violence actually occurred, it continued long enough for Wilde to have seen it happen and not taken action.  Chasmer's uncontradicted testimony is that the violence stopped within seconds of it starting.  There is, therefore, no evidence from which a factfinder could reasonably conclude Wilde observed actual violence occurring without taking reasonable action to stop it.

---

a participant in the violence contrary to the Fourteenth Amendment.

Upon this record, then, the Court must grant Defendant's motion for summary judgment against Plaintiff's failure-to-protect claim as to Defendant Wilde.

### 3.   Section 1983 Municipal Liability

Plaintiff names Cumberland County, Warden Glenn Sanders, Lieutenant Michael Palau, and Captain Kenneth Lancken as Defendants liable under Section 1983 municipal liability. Municipal entities such as counties and their agencies are considered "persons" for the purposes of Section 1983 liability, but are only liable for the policies or customs of the entity itself, and not for the specific acts of individual employees on a theory of respondeat superior.  See Monell v. Dep't of Soc. Serv., 436 U.S. 658, 694 (1978); Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006) ("There is no respondeat superior theory of municipal liability, so a city may not be held vicariously liable under § 1983 for the actions of its agents"); Pinaud v. County of Suffolk, 52 F.3d 1139, 1157 (2d Cir. 1995) (recognizing that actionable claims under § 1983 against a county depends on harm stemming from the county's policy or custom).

Consequently, to survive summary judgment, Plaintiff must point to evidence in the record that raises a question of fact over whether the Cumberland County Defendants have (1) established a policy or custom that deprived Plaintiff of his constitutional rights; (2) acted deliberately and was the moving

26

force behind the deprivation; and (3) his injury was caused by the identified policy or custom.  Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403-04 (1997) (citing Monell, 436 U.S. at 690-91, 694).  A plaintiff can establish causation by "demonstrating that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  Id. at 407.

Defendants argue that Plaintiff has not alleged any custom or policy on the part of the Cumberland County Defendants that violate his constitutional rights.  Plaintiff argues that the Cumberland County Defendants are liable for at least two policies: (1) their policy or custom of failing to train their officers in de-escalation and in calling for backup, or "calling codes", which created a sufficiently obvious risk constituting deliberate indifference to inmate safety, as well as (2) for their affirmative policy that the specific "Code 54" calling for backup when a fight breaks out should not be called by any corrections officer until after a physical blow is struck, rather than, in appropriate situations, prior to the outbreak of physical violence when such violence appears imminent, and (3) from their failure to supervise their officers.

"Policy is made when a 'decision maker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict."

Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality opinion)).  Customs are "'practices of state officials . . . so permanent and well settled' as to virtually constitute law." Id. (quoting Monell, 436 U.S. at 691) (other internal quotation marks omitted).

Defendants assert that Defendants Martinez and Wilde had undergone the training required by the State of New Jersey at the time of the incident. Furthermore, Defendants claim that the Cumberland County Defendants have fully complied with the State of New Jersey's training requirements relating to Defendants Wilde and Martinez.

The record demonstrates that New Jersey law requires two levels of training for new corrections officers.  The first level, or pre-service training (or "agency training"), is provided to new corrections officers prior to their assumption of duties in a state correctional facility.  Kiekbusch Rept. at 5-6. The pre-service training is a short three-week program that is provided by the specific facility itself, with materials that are provided by the state.  The second level of training, Academy training, is performed by a state organization and is required by state law to take place within the first 12-18 months of employment as a corrections officer, pursuant to state law. N.J.S.A. 52:17B-66 et seq.  Plaintiff's expert argues that the

need for such training must be obvious to the County defendants because of the frequency of fights in the CCCF (at least four or five per day) and the fact that many other prisons in other states require such training in their pre-service training programs.

It is undisputed that both Defendants Martinez and Wilde had undergone the three-week pre-service agency training.  Pl's Opp. to Defs.' Mot. 3.  Furthermore, it is undisputed that both Defendants Wilde and Martinez had not yet undergone Police Academy training.  Defs.' Reply to Pl's Opp. 6.  Under N.J. Stat. Ann. § 52:17B-69, the State of New Jersey only requires that officers be sent to the Academy training within 18 months of being hired.  It is undisputed that both Defendants Wilde and Martinez had been working at the Cumberland County Jail for less than a year on the date of the assault.  Pl's Counter Statement of Material Facts at 6.  Therefore, the Cumberland County Defendants followed the policies and procedures in place regarding officer training.  Thus, there is evidence in the record that the decision to not provide training to Defendants Martinez and Wilde beyond what is contained in the CCCF's pre-service training at the time of the assault was a policy of the County Defendants.

Once a Section 1983 plaintiff identifies a municipal policy or custom, he must "demonstrate that, through its deliberate

29

conduct, the municipality was the 'moving force' behind the injury alleged." Bryan County, 520 U.S. at 404. If, as here, the policy or custom does not facially violate federal or state law, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Id. at 407; see also City of Canton v. Harris, 489 U.S. 378, 389 (1989).

Thus, to prevail against the Cumberland County Defendants, Plaintiff must point to evidence in the record raising a dispute of fact over whether the County's policy of permitting Corrections Officers to work in the jail for more than one year without receiving Agency training (or requiring that the pre-service training cover de-escalation techniques and when to call for backup) caused Plaintiff's injuries.

     a.   Failure to Train

The failure to adequately train correctional officers or the failure to implement policies and procedures aimed at preventing inmate violence can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations of the rights of others because only then can the policymaker's subjective awareness of the policy's failures be reasonably inferred. Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011); Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir.

30

2000) (citing <u>Bryan County</u>, 520 U.S. at 408-09); <u>see also</u>, <u>Ricks</u>
<u>v. Norris</u>, Civ. No. 4:08-00345, 2010 WL 2383910, at *6 (E.D. Ark.
June 11, 2010).  Although it is theoretically possible to
maintain a claim of failure to train without demonstrating such a
pattern, the <u>Bryan County</u> Court made clear that the burden on the
plaintiff in such a case is high:

> In leaving open in <u>Canton</u> the possibility that a
> plaintiff might succeed in carrying a failure-to-train
> claim without showing a pattern of constitutional
> violations, we simply hypothesized that, in a narrow
> range of circumstances, a violation of federal rights may
> be a highly predictable consequence of a failure to equip
> law enforcement officers with specific tools to handle
> recurring situations. The likelihood that the situation
> will recur and the predictability that an officer lacking
> specific tools to handle that situation will violate
> citizens' rights could justify a finding that
> policymakers' decision not to train the officer reflected
> "deliberate indifference" to the obvious consequence of
> the policymakers' choice.

<u>Bryan County</u>, at 409, 117 S. Ct. 1382; <u>see also</u>, <u>Ricks</u>, 2010 WL
2383910, at *6 (holding that "Plaintiff [had to] show that the
need for policies, procedures, or training was so obvious and the
deficiencies in these areas so likely to result in the violation
of constitutional rights, that the . . . defendants [could] be
reasonably charged with deliberate indifference to the risk of
harm to inmates.")

The Supreme Court recently discussed "single-incident"
municipal liability and analyzed the <u>Canton</u> Court's hypothetical
with regard to such liability in <u>Connick</u>. See <u>Connick</u>, 131 S.Ct.
at 1360-65. The <u>Connick</u> Court noted that the <u>Canton</u> Court's

scenario presented an "obvious need" for training which could amount to single-incident municipal liability:

> Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain legal knowledge they require.

Id. at 1361.  Still, the Court emphasized the "narrow range" of single-incident municipal liability, and held that "failure to train prosecutors in their Brady obligation" did not fall into the category of single-incident liability. Id. at 1364.  In Connick, the Supreme Court rejected a claim that the District Attorney's failure to train new prosecutors in Brady obligations was a sufficiently obvious need.  Id.  The Court distinguished the prosecutor training situation from the hypothetical situation of arming new police officers without training them in the constitutionally permissible use of force, which would present an obvious need for training.

> i.   Failure to Train Regarding De-escalation and Calling "Codes"

Plaintiff contends the Cumberland County Defendants are liable because of their failure to provide sufficient training for their officers regarding de-escalation and calling "codes" resulted in Plaintiff's assault and subsequent injuries and was sufficiently obviously likely to lead to such failure. The Third Circuit has previously applied the Supreme Court's rulings in

failure-to-train cases to other claims of liability through inaction. See, e.g., Luzerne County, 372 F.3d at 581-82 (holding that juvenile detention center's three-day on-the-job training program's failures to prevent plaintiff's injuries were sufficiently obvious in light of several documented cases of plaintiff's injuries at the hands of other inmates, demonstrated "the need for more or different training of child-care workers to deal with residents like [the plaintiff]"; Beck v. City of Pittsburgh, 89 F.3d 966, 976 (3d Cir. 1996)(holding that a reasonable jury could infer municipal liability based on the City's inaction in response to numerous civilian complaints and departmental concerns regarding the use of excessive force by its police officers).

Plaintiff argues that the need for training regarding de-escalation, as well as recognizing potentially violent situations such that calling "codes" for backup is appropriate is so patently obvious that the lack of such training constitutes deliberate indifference. Plaintiff presented evidence showing that Cumberland County Jail is a particularly "tough" jail due to the fact that it is "run with gangs." Seitzinger Dep. 56:13-23. Officer Seitzinger works with the Special Investigations Unit of Cumberland County Jail; he was one of the investigating officers in the incident. Pl's Opp. to Mot. Ex. V, at 1. Seitzinger also notes that Cumberland County Jail, Mercer County Jail and Essex

33

County Jail are all similarly "tough" since they are all "run with gangs."  Seitzinger Dep. 56:13-23.

Additionally, Plaintiff has presented evidence that approximately four or five fights occur every day at the jail. Seitzinger Dep. 32:25-33:3.  Thus, inmate-on-inmate violence is a common threat to safety.  Furthermore, Plaintiff presented evidence (which Defendants admitted) that the Cumberland County Defendants knew of these conditions by way of incident reports.[13] Pl's Opp. to Mot. Ex. G. Plaintiff also presented evidence that "calling for back-up" is up to the "officers' exercise of discretion" based on their training.  Kiekbusch Rept. at 5. Plaintiff argues that a reasonable fact finder could find that this evidence presents an obvious risk to which the Cumberland County Defendants were deliberately indifferent for their failure to provide sufficient training.

Defendants contend that they have been fully compliant with New Jersey's officer training requirements relating to Defendants Martinez and Wilde, and thus have not been deliberately indifferent to the civil rights of the Plaintiff.  However, Defendants' argument assumes the question.  Plaintiff has argued that the CCCF's pre-service training program was obviously insufficient in Plaintiff's situation, even if it complied with

_____

[13]     Defendant Palau testified that not all fights, however, are recorded in the jail's incident reports. Palau Dep. 48:22.

the state's minimum requirements.

However, "for liability to attach . . . the identified deficiency . . . must be closely related to the ultimate injury." Canton, 489 U.S. at 391. The Supreme Court has made clear that, in addition to the "stringent standard of fault" stated in Bryan County, courts must apply a stringent standard of causation:

> Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability. As we recognized in Monell and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights. A failure to apply stringent culpability and causation requirements raises serious federalism concerns, in that it risks constitutionalizing particular hiring requirements [or other local decisions] that States have themselves elected not to impose.

Bryan County, 520 U.S. at 415 (citing Canton, 489 U.S. at 392).

Here, Plaintiff argues that there is a causal link between the Cumberland County Defendants' failure to sufficiently train its Corrections Officers in responding to inmate violence and "the safety of inmates housed" at Cumberland County Jail. Additionally, Plaintiff's expert, Dr. Kiekbusch, maintains that sufficient training regarding "calling for backup or calling 'codes' is an important element of ensuring the safety and protection of inmates."

Defendants argue persuasively, however, that Plaintiff has failed to adduce sufficient evidence of the causal nexus required to establish a failure-to-train claim.  Plaintiff has offered no

evidence, for example, that the allegedly high number of inmate fights are the sort of fights that could be addressed by additional training in the agency-provided three-week pre-service training on either conflict de-escalation or greater training on when a corrections officer should call for backup.  "The deficiency of a municipality's training program must be closely related to the plaintiff's ultimate injuries." Luzerne County at 582.

The Court finds the case of the CCCF's training distinguishable from that confronted by the Third Circuit in Luzerne County.  There, the policymakers were confronted with repeated documentation of violence committed against the plaintiff himself in a highly predictable pattern related to the plaintiff's diagnosed psychological problems and its effect on other residents of the defendant detention center.  By contrast, here, Plaintiff has pointed only to the fact that fights regularly happen between inmates at the CCCF.  The Court finds that this documentation is not enough for a reasonable factfinder to conclude that Defendants' lack of training led to a predictable outcome of Plaintiff's injuries at the hands of other inmates in this extremely regrettable but unexpected situation. Consequently, the Court will grant Defendants' motion for summary

judgment with regard to Plaintiff's failure-to-train claim.[14]

b.    Failure to Supervise

Plaintiff alleges that the Cumberland County Defendants failed to adequately supervise Defendants Martinez and Wilde by failing to evaluate them in compliance with N.J.A.C. 10A:31-4.5. The same deliberate indifference standard applies to a failure to supervise analysis. See King v. City of Gloucester, Civ. No. 03-5863, 2007 WL 2669409 (D.N.J. Sept. 6, 2007) aff'd sub nom. 302 F.App'x 92 (3d Cir. 2008)(citing Groman v. Township of Manalapan, 47 F.3d 628, (3d Cir. 1995)). Moreover, "a supervisor may be found individually liable under § 1983 if a failure to properly supervise . . . the offending [officers] caused a deprivation of constitutional rights." Okocci v. Klein, 270 F.Supp. 2d 603, 612 (E.D.Pa. 2003). A plaintiff asserting a failure to supervise claim must not only identify a specific supervisory practice that the defendants failed to employ, he must also establish "both (1) contemporaneous knowledge of the

---

[14]    To the extent Plaintiff argues that the CCCF's policy regarding when 'Code 54' can be called (after a fight has broken out) constitutes an affirmative policy that caused his injuries, the Court concludes that the policy is not violative of Plaintiff's Fourteenth Amendment substantive due process rights, as Plaintiff has pointed to no evidence that the policy of Code 54 is an affirmative prohibition against corrections officers' discretionary calling for assistance under a different code, "Code 26," which signifies that an officer needs immediate protection or help.  See Palau Dep. 46:15-47:3.  Thus, the Court concludes that summary judgment is also warranted on any claim related to "Code 54" operating as an affirmative prohibition on the calling for backup.

offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisors' inaction could be found to have communicated a message of approval." <u>Bonenberger v. Plymouth Township</u>, 132 F.3d 20, 25 (3d Cir. 1997) (quoting <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 673 (3d Cir. 1988)).

With regard to Plaintiff's claim that the Cumberland County Defendants failed to evaluate Defendants Martinez and Wilde, it is undisputed that neither was evaluated prior the assault of Plaintiff. Defs.' Response to Pl's Counter Statement of Material Facts, ¶ 98. Furthermore, it is also undisputed that both Defendants Martinez and Wilde were employed with the Cumberland County Jail for less than one year at the time of the assault. Pl's Counter Statement of Material Facts at 6.  As Defendants point out, N.J.A.C. 10A:31-4.5(a) says that "[e]ach employee shall have an annual written performance evaluation based upon defined job criteria and performance standards." N.J. Admin. Code 10A:31-4.5(a).

Plaintiff does not argue, however, that Martinez and Wilde should have been evaluated more frequently than was called for in the NJAC.  Rather, Plaintiff's failure to supervise claim stems from the Cumberland County Defendants' failure to evaluate their <u>other</u> officers who had worked at the CCCF for several years and were, admittedly, not being supervised annually as called for in

the N.J.A.C. 10A:31-4.5(a).  Since the particular Defendants
present at the fight, Martinez and Wilde, had been employed for
less than one year at the time of Plaintiff's assault, no
reasonable jury could find that the Cumberland County Defendants'
failure to supervise contributed to the alleged violation in this
case.  See Bryan County, 520 U.S. at 400 ("in enacting § 1983,
Congress did not intend to impose liability on a municipality
unless deliberate action attributable to the municipality itself
is the 'moving force' behind the plaintiff's deprivation of
federal rights.").  Therefore, the Cumberland County Defendants
are entitled to summary judgment as to Plaintiff's failure to
supervise claim.

C.   **Motion to Exclude Expert Testimony**

Aside from the motions discussed above, Defendants have
moved in the alternative to exclude the expert report of
Plaintiff's expert, Dr. Richard Kiekbusch,[15] on the grounds that
it is not reliable.  The Court has concluded that the methodology
employed by Dr. Kieckbusch is sufficiently reliable that it will
deny Defendants' motion to exclude on this ground, though the

---

[15]   Dr. Kiekbusch is an Associate Professor of Criminology
at the University of Texas-Permian Basin in Odessa, Texas.
Kiekbusch Rep. at 1. He is currently a member of the National
Jail Leadership Command Academy, and the former President of the
American Jail Association. Kiekbusch Rep. at 1. He received his
B.A., M.A. and Ph.D. in sociology and has over 20 years
experience in correctional administration, including 13 years in
jail management. Kiekbusch Rep. at 1.

Court notes that, in the wake of the determination explained above to grant summary judgment against most of Plaintiff's claims, the Court and parties, as the case proceeds to trial, may need to revisit the admissibility of Dr. Kieckbusch's opinions as to their "fit" in assisting the jury on the remaining issues for trial, an issue not addressed by any party in this motion.

    1. <u>Admissibility of Expert Testimony Under Rule 702</u>

  The admissibility of expert testimony is governed by <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the Supreme Court explained in <u>Daubert</u>, district court judges perform a "gatekeeping role," 509 U.S. at 596, by assessing whether expert testimony is both relevant and methodologically reliable in order to determine whether it is admissible under Rule 702. <u>Id.</u> at 590-91.

  Under the law of this Circuit, <u>Daubert</u> and Rule 702 call upon the Court to examine the admissibility of expert testimony

in light of three factors: the qualifications of the expert, the reliability of his or her methodology and the application of that methodology, and whether the testimony fits the matters at issue in the case.  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994); see Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).  An expert's qualification to testify is based on whether the witness has the "specialized knowledge" referred to in the rule regarding the area of testimony.  Id. Reliability refers to the rule's requirement that "the testimony is the product of reliable principles and methods," and is governed by the Supreme Court's Daubert decision.  Daubert, 509 U.S. 579.  Finally, there must be "a valid scientific connection" -- a so-called "fit" -- between the expert's testimony and the facts and issues in the case in order for the expert's testimony to be admissible.  Paoli, 35 F.3d at 743.  The proponent of expert testimony must establish the admissibility of the expert's opinion by a preponderance of the evidence.  Id. at 744.

Defendants concede that they are not challenging Dr. Kiekbusch's qualifications.  Defendants argue, instead, that Dr. Kiekbusch's expert report is not reliable and thus should be barred.

Recognizing that the "inquiry as to whether a particular scientific technique or method is reliable is a flexible one," the Third Circuit has identified a nonexhaustive list of eight

41

factors that courts may address in determining whether an expert's methodology is reliable.  Bowers v. Nat'l Collegiate Athletic Ass'n, 564 F. Supp. 2d 322, 346 (D.N.J. 2008) (quoting Paoli, 35 F.3d at 742).  The factors identified by the Third Circuit for assessing the reliability of an expert's methodology are:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Bowers, 564 F. Supp. 2d at 364, n.19 (quoting Paoli, 35 F.3d at 742, n.8).

As the Third Circuit has made clear, the standard for admissibility under Rule 702 is "not that high."  Paoli, 35 F.3d at 745.  Parties are not required to "prove their case twice -- they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."  Id. at 743.

### 2.   Motion to Exclude Dr. Kiekbusch's Expert Report

#### a.   Dr. Kiekbusch's Report

In connection with this litigation, Plaintiff retained Dr. Kiekbusch to evaluate Cumberland County Jail's training

procedures and policies for its Correctional Officers regarding the handling of inmate tension and violence.  Kiekbusch Cert. ¶ 1.  On February 8, 2011, Dr. Kiekbusch submitted an expert report to Plaintiff.  In preparing his report, Dr. Kiekbusch reports that he reviewed, among other things, the parties' and witnesses' depositions, documents concerning the investigation of the assault on Plaintiff, Cumberland County's "pre-service training" policies of its Correctional Officers, as well as Correctional Officers' training standards from Virginia, South Carolina, Wisconsin, Washington, and such standards and programs promulgated by the American Correctional Association and the American Jail Association.  Kiekbusch Report at 1-2; Kiekbusch Cert. ¶ 4.

Dr. Kieckbush's report contains five Opinions, based on a varying collection of the information he provided.  Kiekbusch Report at 4.  The five opinions are:

1) the CCCF pre-service training was insufficient in that it failed to include training in how to de-escalate a fight among inmates and how to exercise discretion in calling for backup.

2) the CCCF administration failed to adequately supervise officers generally

3) the CCCF administration should not have assigned Correctional officers Martinez and Wilde together, because they were both inexperienced.

43

4) Correctional officer Martinez failed to intervene in the attack on Plaintiff; and

5) Correctional officer Martinez failed to call for backup when it must have been obvious that the unrest could become violent.

Dr. Kieckbush supports the first opinion with an examination of the frequency of fights and violence in the CCCF, with an examination of the materials provided to new correctional officers in the pre-service training, with a comparison of these materials to other state's pre-service training materials, and the recommended training materials provided by the American Correctional Association and the American Jail Association.

Dr. Kieckbush supports the second opinion by citing to the general state of officer evaluation procedures in place at the CCCF at the time of the assault, and by noting that Martinez and Wilde had not yet been evaluated, and by noting testimony in depositions of inmates regarding regular practices of other corrections officers (not Defendants Martinez and Wilde) that fights are occasionally allowed to take place despite the officers' awareness, and his general awareness of the need for proper training and evaluations.

Dr. Kieckbush supports his third opinion with reference to the fact that Martinez and Wilde were inexperienced and that the general understanding that experience is important in minimizing

44

inmate violence.

Dr. Kieckbush supports his fourth opinion with reference to testimony of the Plaintiff, inmate Chasmer, inmate Santiago, and inmate Childeress.  He also supports this opinion with reference to the layout of the D-Pod, schematics of the facility, the internal affairs investigation of the assault, and the testimony of Officer Seitzinger that, he believed, Martinez and Wilde "may have frozen before responding."

Dr. Kieckbush supports his fifth opinion with reference to the depositions of Seitzinger and Palau, which described the layout of the area of the CCCF, and the approximate location of other corrections officers.

b.   Reliability of Dr. Kiekbusch's Opinions

Defendants' motion to exclude the expert report of Dr. Kiekbusch argues that his opinions, as a whole, without differentiation, are unreliable because "he does not supply any objective data . . . and relies instead on broad speculation while considering the standards of other jurisdictions.  Defs.' Reply to Pl's Opp. at 30.  For the following reasons, the Court finds that Dr. Kiekbusch's opinions are admissible under Rule 702.

In <u>Lasorsa v. Showboat: The Mardi Gras Casino</u>, Civ. No. 07-4321, 2009 WL 2929234, at *4 (D.N.J. Sept. 9, 2009), this Court noted that "there is no reliable foundation for [an

expert's] expert testimony" when an expert would "seem[] to base
his conclusions on his own authority . . . [w]ithout 'industry
standards' to rely upon," . . . [b]ecause 'knowledge connotes
more than subjective belief or unsupported speculation.'"
Lasorsa, 2009 WL 2929234, at *4 (citing Grninich v. Bradlees, 187
F.R.D. 77 (S.D.N.Y 1999)(internal citations omitted).  In
Lasorsa, this Court found that the expert's testimony should be
precluded under Rule 702 because it lacked "reliable, objective
basis . . . stemming from identifiable industry standards, codes,
publications or training."  Lasorsa, 2009 WL 2929234, at *4.

On the other hand, this Court, in Lasorsa, noted that
"expert testimony regarding use of [a] clothing rack in [a]
personal injury case [was] admissible where [the] expert took
into account reliable publications and had years of experience
operating a bona fide retail safety consulting business."
Lasorsa, 2009 WL 2929234, at *4 (quoting Wisdom v. TJX Cos.,
Inc., 410 F.Supp. 2d 336, 342 (D.Vt. 2006)).

Similarly, in this matter, although, as Defendants contend,
Dr. Kiekbusch does not rely on any of "New Jersey's standards for
correctional facilities," Dr. Kiekbusch does purport to rely on
and consider national training standards and numerous other
states' standards for correctional facilities.  Dr. Kieckbush
compares these standards to the training materials that were
presented to new officers at the CCCF.  Riback Cert. Ex. C.  The

Court finds that the national standards promulgated by the American Correctional Association, the training programs offered by the American Jail Association, and the pre-service training programs offered in other states constitute recognized industry standards or general practices.  The Court therefore concludes that Dr. Kieckbush relies on objective data and standards.  Defendants' motion to bar his expert report based on unreliability will be denied.

As noted above, however, because Dr. Kieckbush's opinions appear to relate to claims for recovery against which the Court has granted summary judgment, there may be reason to question the admissibility of the report on the grounds of its "fit" and whether Dr. Kieckbush's testimony would assist the trier of fact on the issue of whether Defendant Martinez violated Plaintiff Thomas's Fourteenth Amendment right to Due Process by inciting a fight in which Plaintiff was injured.  Therefore, the Court's denial of Defendants' motion to exclude will be without prejudice.  If, as the case proceeds to trial, the parties are unable to agree on an appropriate use for Dr. Kieckbush's expert testimony, either party may raise the issue in a properly filed motion in limine.

## IV.  CONCLUSION

For the reasons stated above, the motion for summary

judgment by Defendants will be denied with respect to Defendant

Martinez, but granted with respect to Defendants Wilde,

Cumberland County, Warden Glenn Sanders, Lieutenant Michael

Palau, and Captain Kenneth Lancken.

This Court will also deny Defendants' motion to exclude Dr.

Kiekbusch's testimony consistent with the discussion set forth

above, without prejudice to requiring Plaintiff to demonstrate

the "fit" of these opinions before they can be offered at trial.

The accompanying Order will be entered.


**December 22, 2011**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         United States District Judge